May it please the Court, Patricia Millett on behalf of the Gila River Indian community. Also presenting on behalf of appellants this morning will be Ms. Stetson on behalf of the City of Glendale and, excuse me, Mr. Cole on behalf of the State of Arizona. How do you intend to divide your time? You're taking 10 minutes, is that right? Yes, I've got 10 and then 8 and 2. Glendale and then State of Arizona. Thank you, Your Honor. The substantiality and importance of the issues presented by this case required the most careful consideration and analysis by the agency of the meaning and signification of Sections 6C and 6D of the Gila Bend Land Replacement Act. That did not happen in this case. And with respect to 6C in particular, the agency not only refused to issue a careful reasoned decision-making, but did so under the cloak of an unprecedented and profoundly unreasoned conception of issue waiver in administrative proceedings. They understand what they want this Court to do. They want you to write an opinion that says issue waiver can apply to entities that had no agency notice of the proceeding, no access to the agency record, did not have any party status, rights, or process before the agency, were not treated even handedly with other parties, through an entirely ex parte process. And then they want you to take. What did your client submit during the administrative proceeding? We submitted not during the proceeding. We met separately on the side with agency officials. We had no right. There is no proceeding. Right.  Application. We heard about it, not from the agency. The agency did not. So number one, there's no doubt that you heard about it, you knew about it, and you submitted extensive papers to the agency. We don't dispute that. We do not dispute that. We tried, fought very hard to overcome the nature of this ex parte proceeding and did everything we could to get our foot in the door. But the waiver principle to be predicated when there is no agency notice and no access to the record and no even to the agency's status or proceedings. And understand, they want that waiver rule not to apply only to people who did submit things, but people like the State of Arizona, individual members of Glendale and of the community who didn't participate in the proceedings. Well, let's, let's, let's, I'm going to try to bypass your argument just a little. What if we agreed that this argument is not waived? Wouldn't we have to remand the issue nonetheless? Let me answer that in two parts. The question of what Section 6C means, and I'm happy to talk about Section 6D or Ms. Stetson will, however you prefer. But what that statute means is the plain, plain meaning of the statute is that this is a purchase limitation. Well, but just a minute, just a minute. If we find the argument is not waived, answer my question. Doesn't that say I'd need to remand to the agency? I have a two-part answer. The first is that the plain meaning of the statute does not get remanded. But then application of that plain meaning to the facts of this case. So the factual finding, the predicate, would have to go back to the agency. But I want to make crystal clear that the plain meaning of the statute, of course, is not remanded to agencies, and that plain meaning is informed by the constitutional avoidance principles. This Court asked for us to be prepared to discuss Gregory v. Ashcroft, which is a plain meaning statement rule of the Court when there are significant Federalism constitutional questions presented. Well, the corollary that I think really operates here is a constitutional avoidance principle. And this Court, and we've submitted a letter to the Court this morning, has a case specifically held that when you deal with constitutional avoidance, the agency doesn't go to Chevron Step 2. Constitutional avoidance takes control at Chevron Step 1. But, of course, let's step back, because that's presuming that there's some constitutional question we're avoiding in the first place. What is the constitutional question in your view? There are two, specifically with respect to 6C. The first one is the waiver rule itself here has significant constitutional implications as applied to a State that did not participate in it. Okay. Now, let's assume, as Judge Smith laid out, let's assume we would parachute over that either for constitutional avoidance reasons or some other practical reason and say, let's just assume that there wasn't a waiver. And now we're smack in the middle of 6C. Then, so for 6C, and there are constitutional avoidance issues both for 6C and 6D. So 6C is your first race. The issue there is whether the statute should be interpreted. There's two ways to interpret it, and we think the plain language one is that it is a specific land replacement, land swap, like the title of the statute says, with a tribe that lost land that was at the hands of actions of the United States government. Or you can view it as the Nation does here, and that is as essentially a shopping spree where they can go out and buy land, and all the land their money will buy, and sit on it. There's no pressure. There's no limitation on what they take into trust. So they get to wait and sit back and pick and choose. Let's see how land develops.  Sotomayor, let me just stop there. I understand the two different views. I'm still looking for the constitutional question. And so the constitutional implications are that it is much more unsettling, unstable, and intrusive on States and local governments and Indian tribes that all live in this crowded area to have a capacity to be on a limitless shopping spree and to spring unknown after, for example, the Glendale parcel owned for six years under another company's name. They waited until the development happened. Now, the basic Federalism of this Court ---- Sotomayor, let me ask you about this shopping spree approach. Would you agree that in general the tribe can take its money and go out and buy what's on the market? In general, the tribe can take its own money and buy private land. But to have ---- Okay. So let me start there. So they can go out, just like you or I might if we decided to buy some land in Arizona, and put down their money and take title to the tribe, correct? To the land, yes. To the land. And the tribe would hold title with no particular reservation status, correct? Presumably, although they could apply for discretionary ---- let me be clear. At least initially. Initially. They can't be a landowner like you or I would. Be simple. But once they can apply, and until 2004, so for the first 20 years of the statute's operation, so that's how we look at how Congress wrote this, there was the mandatory trust acquisition, but then they would have had the capacity, Congress would have known, even for nonmandatory trust, if they could buy other land, that they would have been able to ask for that to go into discretionary trust. And it is when it goes into a trust status that the land takes on political signification and becomes Indian land with the authority and the implications that that has for local governments. Now, normally what happens is the Federal Government finds its own land and does that, or it takes it under its own name, or the Secretary of Interior goes and identifies the land. And on plain meaning, if you look at 6C and you take out the nation and you put in the name Secretary, if Congress said to the Secretary, here's some money, you are allowed to purchase land not to exceed 9880 acres, there's no doubt that the Secretary would know they can't buy 16,000 acres with that money. And simply letting the nation take the – have the discretion to find the land, but capping it, containing it, and making it narrow ensures that you don't have these surprises that are – can cause instability. And these are surprises that are not on aboriginal land of the nation.  And I want to ask something else that occurs to me in looking at the language of the statute and following up on an early conversation about, you know, you can go out and you can buy land, just regular. But if you go out and do that and you're a tribe, then you don't have any status of any of these Federal reserved water rights, correct? No, that normally goes – attaches to the trust status. So I guess I'm having some trouble giving meaning to that, which is only relates to Federal purpose lands under 6C, when it says you can acquire in the aggregate, you know, 9880 acres, correct? Yes. So it has to be those – you can have up to that amount of land, up to that amount in Federal purpose lands, correct? You can have – there's two things going on. You can buy that much land with our money, period, full stop. Okay. So where does it say with our money? That's the with our money part. I'm having trouble connecting because it doesn't say there with our money. Understand that it has to mean that, because if other – Congress would lack the power to pass a statute saying to the Tohono O'odham Nation, you with your own money can only go buy 9,880 acres, Congress can't do that to a private party, whether it's a tribe or an individual. They don't get to buy a billion acres. If their own money, Congress doesn't get to – I mean, I don't know. But only 9,000 of them could possibly go into trust status, correct? But we need to understand that there are two – there's a reason Congress has a 6C and a 6D. And it was given short notice up front. It knew those were going to be the two pieces of land. They were going to be the same, but it has to mean with our money in 6C, because it would be – the Nation would be the one having a constitutional argument. I'm sure if Congress tried to tell it, it can never buy private land. But you have to – let me just unpack that. It's not saying you can't buy private land. You – because we just established if they have a bundle of money, they can go buy whatever they want if somebody will sell it to them. But the way – it seems to me that there's some symmetry here in the sense of if we took away this much tribal land that was in trust, you can't get more than that back. Do you agree that that's part of the purpose behind C? We think that is the purpose behind 6C, is it is, as the title says, a land replacement. And it has – and the words in the – excuse me, not to exceed, have got to mean that those Federal monies can't go buy more land beyond 9,880. And Congress can't. But the Federal money doesn't have to be used to buy land in the first place, does it? It doesn't have – it's a cap. And so they could – it's – there are a few specified authorizations for expenditures in 6A, so they can't do anything they want with it. And there are specific prohibitions. You can't make per capita allocations. But 6C has no meaning at all unless it is a distinct cap on how much land can be bought. And Congress understood that the land that is bought with these Federal funds will also be eligible if the nation wants for mandatory trust status. But it did not want them to buy another 7,000 acres that were eligible for discretionary trust status at a time of their choosing, waiting for lands to develop, and springing it on communities. And I do want to make sure I reserve time for rebuttal and for my co-counsel, but I do want to answer any questions that you have. Sotomayor, stop, because I don't think that Judge Smith had a question. All I was going to suggest is it seems to me that I'm still having trouble why we shouldn't send this back to the agency. Even with legal questions, the Supreme Court has said, and I quote the cases. You quoted them in your briefs. We find it appropriate to remand to the agency for an initial determination of the statutory interpretation question and its application in this case. And so I'm still having trouble to decide, even if I find it's waived, why I shouldn't send it back to the agency. But it's certainly better than the waiver ruling we got here. But the Supreme Court has never ordered remand of a statutory question that is resolved on Chevron Step 1. It only remands to agencies questions that need to be the legal questions that need to be addressed under Chevron Step 2. But let me be crystal clear. A remand would be needed here, once they're told what the plain meaning of the statute is, to then apply it to this case and to look at the facts and make the factual findings. Kennedy. My worry about that, again, is this. You have one argument, which you claim to be a pretty good argument, about what this particular statute means and its statutory interpretation. The other side has another argument about what the statute means. And generally, if it's an ambiguous situation, I send it back to the agency to tell me what it means. Well, certainly if it's ambiguous. If you decide it's ambiguous, you must remand. I do not dispute that. But courts do not simply say if two people are arguing, it can't have plain meaning, particularly when you have the constitutional avoidance candidate driving Step 1. Okay. And if you agree with me, then, don't you think that the Section 6b, where it says the Secretary of Interior shall not be responsible for review, approval, or audit of the use or expenditure, kind of counters what arguments you're making? No, not in the least, for two reasons. That language is about responsibility and liability to the Tohono O'odham Nation. That's how the audit process in Indian law works. And as the guidance that we submitted to the Court last week, the agency guidance made clear, the Department of Interior understands that there are statutes that will put caps on purchases like this one does, and when they do, it is the burden on the Nation or the Indian tribe at issue to demonstrate, to make a showing that they haven't exceeded that cap. They understand that to be different from the very comprehensive and complicated auditing and trust management responsibilities that the Department of Interior can sometimes have for agency lands, for tribal lands or tribal funds. And so it was simply making clear, an important thing to do in 1986, that that status, that auditing, that type of trust responsibility and liability to the Tohono O'odham Nation is not going to apply, but their own guidance says there's a difference between that and making the Nation prove the statutory elements prescribed by Congress have been met. Before you leave, one more question, and that is on the question of statutory interpretation of Section 6, didn't the Secretary, in fact, make a statutory interpretation on 6C? Or they did not. Now, there is argument about what the field solicitor did, but in this case, 6C was not even at issue until these facts were found, which would have to be brought up.  And I'm not sure that that's a legitimate question because they only looked at the land that was in trust in their analysis. Is that an implicit way of addressing this very question that you're raising? I don't think so any more than it's more implicit when this Court addresses issues presented and doesn't address issues that are not factually presented by a case, and you have no reason to even know that they're in the picture. It's when it came into the picture, and we took that information as soon as we had it, as soon as we found that this was the pricing of the land was done to prevent the very purchase cap that's at issue in 6C, that we took that to the agency and they said we're doing nothing with it. And then we took it to court and said you've got this new information that has triggered a whole new issue that no one knew was in play, no one other than the nation knew was in play. Thank you. Thank you. I'm afraid I've overspoken on my time. No, we took up your time. So we'll now hear from Ms. Stetson, and just for making this easier, if you wouldn't mind to put 8 minutes on the clock so that Glendale has its full amount, and we may exceed your time again.  This is not uncomplicated. Okay. Julie Warren, thank you, Your Honor. Thank you. Kate Stetson for the Glendale appellants. Both you, Judge McEwen, and Judge Smith began by asking several questions that went to really the ordering of your decision. What do you have to decide? And if you decide X, then what? So I thought I would start with respect to the 6D argument by setting out what we think are basically the three roots of decision. Here's Route 1. Route 1 is our plain language argument is right. When 6D speaks about land not meeting the requirements of the Gila Bend Act when it is within the corporate limits of any city or town, it means just what it says. Land that is within a city's corporate limits is excluded from consideration under the Act. This land is within Glendale's corporate limits, and that should be the end of the matter, full stop. If you agree with us about that ---- And if we thought it was plain language and went the opposite way, then I guess we'd have different ways of looking at plain language, right? Yes. If you think it's plain language and it goes the opposite way, which, remember, no one but the Secretary has bought off on until now, because even Judge Campbell concluded that this was ambiguous, if you conclude that the government's initial plain language interpretation was right, I think you'd have to go straight to the Tenth Amendment argument. That's a separate route. But if we're right on plain language, then you can stop right there. The appellants win. There's no need to get into any constitutional issues, any canonical hierarchy issues, or anything of the sort. Right. Here's Route 2. Route 2 is the question that this Court posed on Friday, which is the clear statement Ashcroft v. Gregory rule. That is, as Ms. Millett pointed out, a rule that sounds in kind of a constitutional avoidance issue. And this, the reason that this rule is, I think, useful and particularly applicable to the 6d issue in addition to the 6c considerations that Ms. Millett articulated, it has to do with the notion that if the disposition of land is not plain on the face of the Gila Bend Act, and if this Court can interpret the Gila Bend Act in a way to avoid the constitutional problems that would crop up if the Court were to find that the State's land could be arrogated for use by an Indian sovereign, then you pursue that statutory interpretive route. That's why I'm having some trouble, because it seems to me that the way this is set out, that in effect the Congress realizes, look, I don't want to get into the State and the city, so here's what I'm going to do. If I'm going to take this land in trust, it can't be land that's implicated, you know, by, within the city's corporate authority, because I don't want to get into that, Congress says. So if you interpret it that way, where do you – where is the constitutional collision? Well, I think – I think, Judge McEwen, you're – the way that you just articulated the question accepts some of the basic premises of the Secretary's plain meaning argument, right, because the plain meaning argument, which you can find at Record Excerpts 30, the excerpts that we submitted, has to do with the notion that the Secretary concluded, and I'd point you in particular to Note 4 of that page, the Secretary concluded that he was required to interpret that statute to ask the jurisdictional kind of question, the corporate jurisdiction question that you raise, that he was required to do that. That, of course, is a – is a – is sort of a red flag word under the Chevron analysis, because it means that the Secretary's assessment stopped at plain meaning. What you're posing, Judge McEwen, is something that's – you know, sort of shades into Chevron Step 2 in this way, because it suggests that maybe there was some sort of interpretive room for what exactly corporate limits means. The problem, though, under the plain statement rule, is unless this statute on its face says, Congress specifically considered and concluded that this particular land could be taken from a State and given to a tribal sovereign, the clear statement rule would suggest that you not interpret the statute that way. And, of course, just to take a quick detour into your – Oh, if I might take a detour before you get there. Sure. The Secretary found, evidently, that the language was clear and unambiguous, correct? That's correct. So if I'm suggesting that the – as to Route 2 now, if I'm suggesting that the statute is ambiguous, and it's ambiguous in a way to not determine exactly how to go with 6D, don't I have to send that back to the Secretary to have a chance to think about that? Because the Secretary did not review that under a clear – under an ambiguous situation. You're exactly right, Judge Smith, yes. And therefore, wouldn't the – wouldn't then the agency need to make the first determination? Yes, but the – the route that you've just articulated – remember, I started by saying there are three routes, plain language, we win, clear statement, we win. Your – you've just articulated Route 3. Okay. Which is, if you conclude that for some reason the clear statement rule doesn't apply, then you look at the fact that if you don't buy our plain language argument, you don't buy the clear statement argument, you presumably don't buy the tribes' and the government's plain language argument, you're left with exactly what you just articulated, which is the statute is ambiguous, the Secretary plainly did not exercise his interpretive authority, as you just characterized it, and then a remand would be necessary. So basically – Wouldn't that also be necessary to determine even if we ought to use any constitutional doctrine or whether they're interfering in state rights in that, even in that situation? No, I don't think so under the – under the Ashcroft v. Gregory rule, because the Ashcroft rule asks at Chevron step one, and this is the – the import of the case that the Gila tribes submitted to you this morning. I read all the cases. I've never seen a situation where a court has said that this is an ambiguous statute. I don't know how to exactly interpret it, but I'm going to take it right from you, even though ambiguous, and tell you that it's wrong. I think that's – I think, Judge Smith, you're fastening on the – the notion of ambiguity without sufficient heed to the fact that when we look at the clear statement doctrine, that's a Chevron step one doctrine, and it's – it doesn't – it doesn't sit easily against Chevron two for this reason. Well, I've never seen clear step doctrine that you're talking about it applied other than when the Secretary has considered an ambiguous situation and made its determination and forgot to worry about the clear step – clear language. No, I think there is no – you know, the doctrine that we cited to you, the doctrine that originated perhaps with the Peter Pan case out of the D.C. Circuit and then was adopted in Noguse and then by this Court in Delgado, goes to the question about ambiguity. It doesn't suggest that at Chevron step one, an agency must be given first crack at interpreting a constitutional question vis-a-vis the statute. Did you even raise – I mean, this whole issue of – we did ask you to discuss it here, but I don't think that you raised the plain statement rule. We did not raise the clear statement interpretive rule, but as this Court – as you observed, this Court asked us to – to be prepared to speak on it because the rule of the – Right. But let's just be clear, you didn't raise that in your briefs, correct? No, we did not, nor did we below. Of course, we've maintained that the meaning is plain, and if the meaning is not ambiguous, just as Judge Smith suggested, if ambiguous, then it gets remanded. If it is plain in the nation's favor, in the Tohono Nation's favor, in the government's favor, of course, then you have to move straight to the Tenth Amendment question. First, though, Judge McKeown, to your question about whether or not there's any significance to be drawn from the fact that we raised it or didn't raise it, because this is a constitutional avoidance issue, I'd submit that we didn't have to. It's not really a pure waiver problem. Let me speak briefly, if I can, because my time is running out, on the – on the Tenth Amendment issue specifically, just to make sure I – Let me just go back. I thought you said there were three routes, and we went to two. Did I miss three? Did you say what the third was? The third was the route that Judge Smith articulated, which is if the Court concludes that this is ambiguous, and that the clear statement rule doesn't apply at Chevron Step 1, for whatever reason, then it has to get remanded. Now, presumably, the only reason the Court could conclude that the clear statement rule doesn't apply is if it finds that there is absolutely no disruption of the constitutional balance between Federal and State here. I would direct you then to the Tenth Amendment discussion in our brief and our reply. There plainly is a significant Tenth Amendment problem that arises when a – if the Federal Government purports to take land from one sovereign and give it to another. I would make just two quick points on this. Particularly because, as we've observed in our reply brief, the government doesn't really join issue with us on Seminole Tribe, which we think is particularly controlling here. I would point you, though, to the case that the government invokes, and the nation – the Tohono Nation as well, which is Garcia. One of the things that Garcia specifically says, and I want to quote this, is, with rare exceptions, like the guarantee in Article IV, Section 3, of State territorial integrity, the Constitution does not carve out express elements of State sovereignty. That is exactly this case. We are talking about State territorial integrity here. The Tenth Amendment plainly is called into question. And in those circumstances, the clear statement rule should apply to govern for a ruling in our favor, either because we're right on the plain meaning or because it's not clearly stated that this statute was meant to take land away from the State in these circumstances and give it to the Tribe. Thank you. We'll now hear from the State of Arizona. It looks like you're using up all your time in your primary, no rebuttal time is the way you've organized it. So if you would please put two minutes. Thank you very much. May it please the Court, my name is Dave Cole, Arizona Solicitor General. I'd like to make three brief points. First, the State of Arizona agrees with Glendale and the community that neither has waived its claim pursuant to Section 6C of the Gila Bend Act. Even if either of those parties could be said to have waived their claim, the State of Arizona most certainly has not waived any claim. Arizona had no notice of the process that culminated in Secretary's July 2010 decision and had no access to the record. Because Arizona did not have an opportunity to participate in the process, it would be unfair for the Court to hold that Arizona has waived any claim it might make in connection with the land that is the subject of this lawsuit. Second, at the very least, the phrase, within the corporate limits of any city or town, as that phrase appears in Section 6D of the Act, is ambiguous. If the Court so concludes, it should remand the matter to the Secretary to give him the ambiguity in a clear, reasoned fashion that will be amenable to judicial review. Why should we remand when he says it's not, and not ambiguous, it's clear and unambiguous, and he's already said what it says? Aren't we just going to get the same thing? Well, I don't think we will get the same thing, and at the very least, the State of Arizona deserves the chance to weigh in and be part of the process. Well, now you can weigh in on the plain meaning, and everybody keeps landing on this Flagstaff case, and everybody reads it a little bit differently about what was in, what was out. What's your response to the legal question that's in front of the Court on the Secretary's interpretation? Well, the State of Arizona's view is that the statute is, in fact, ambiguous. And Judge Campbell so found when he ruled on it. Oh, and I respect Judge Campbell, but what if he was wrong about that? What if the Secretary was right? I mean, why – what is it about the Secretary's ruling that you take issue with? Where's the ambiguity in your view? Frankly, the phrase within the corporate limits of any city or town is very different than the statute simply saying you can only use unincorporated land. That would be clear. But doesn't some of Arizona's own statutes use the phrase within the corporate limits in exactly the same way the government argues we should use it here? Well, they argue that it's exactly in the same way. We don't necessarily agree with that argument, but it's clear that there is Arizona law that talks in those terms. Do you have any Arizona law that would say you're wrong, not me, them, but, you know, the Secretary's wrong? What – do you have any Arizona laws about that? Just as we've cited in the brief, but nothing more specific. But, I mean, so what I'm left with, to be honest, is no Arizona law to the contrary. Well, in any event, Arizona law would be nothing more than persuasive anyway in this particular context. But you're right. Other than the Flagstaff case, which we've cited, and we agree that that leaves the Court in a somewhat difficult position, all the more reason to remand, let the Secretary bring to bear the expertise and experience that the law talks about and decide based on this case how this ambiguous statute should be applied. And you'd agree with me that Flagstaff is really not on all fours with this case because in Flagstaff, the NAU campus would have been previously annexed, correct? Correct. It is not on all fours. That's correct. That's the best we have. We're on an island, right? In a way. All right. Thank you. Third and last, each and every state in the unit is deemed a sovereign entity. For Arizona, the concept of sovereignty is nothing more than an illusion if the Secretary's decision is permitted to stand. Implicit in the concept of state sovereignty is the ability of the state to control its own territory. The United States Supreme Court has recognized on multiple occasions that although the states surrendered many of their powers to the federal government, they retained a residuary and inviolable sovereignty. A state that is deprived without its consent of what the United States Supreme Court calls territorial integrity protected by Article IV, Section 3 of the United States Constitution is not a sovereign state at all. This is neither what the Founding Fathers contemplated nor is it consistent with current settled constitutional doctrine. Unless the Court has more questions, I'll close. Thank you. Thank you. Thank you for your argument. We'll now turn to the appellees and intervenor appellee of the United States and the nation. So is the United States going first? Yes. And how do you plan to split your time? I'll be using 12 minutes. Mr. Waxman, representing the Tohono O'odham Nation, will be using 8 minutes. May it please the Court, Aaron Abloh on behalf of the Federal Defendants. First, I'd like to first turn to the 6C issue, and I just want to be clear that the Secretary did consider the meaning of Section 6C, and that would be excerpts of record 31, 26, and then the field solicitor at pages 22, our supplemental excerpts of record 281, note 2, supplemental excerpts of record 282, and 279. So I think not only is it fairly included in an underlying premise of the Secretary's decision, I think there's enough in the record here. And the record is clear that the Secretary considered the meaning of 6C and here concluded that it is a limit on the number of acres that can be taken into trust for the tribe, not some limit on the number of acres that the tribe might be able to purchase with HILA Band Act funds. On that, I think it's telling that Section 6C doesn't reference the funds at all. Instead, Section 6A is what addresses what the tribe may do with the funds. Sotomayor, would you just step back one moment to try to frame your argument in part response as made by the appellants? And that's the question of, in your view, in the Secretary, if we accept your view that the Secretary did make an interpretation, did he do that on plain notice?    interpretation? Was it a reasonable interpretation at the meeting or with Step 2 of Chevron? Well, I think the question for this Court either way is whether it was a reasonable two purposes in enacting this act. One was to provide $30 million for the tribe's economic development and the ability to the Secretary to acquire 9,880 acres in trust. And that's made clear in the House report at page 8. So I think also the structure of the statute, as the Court, I think, recognized, Section 6C talks about there being no reserve water rights. And that would only be implicated, reserve water rights are typically associated when the United States creates a reservation. Then there is common law that that includes reserve water rights. And by 6C, therefore, talking about reserve water rights contemplates that this is going to be trust land. I just want to step back because this really goes more to how we structure our thinking. If the Secretary relied only on the text and wasn't making an interpretive ruling, would we have to remand? And we've had some cases, like in the immigration context, where we've said that. Well, I think the Delgado case is distinguishable. I mean, that was the case. Okay. Delgado. It was. That's right on. It's distinguishable from this case because there it was dicta. First of all, it was dicta. And the footnote was talking about if there were ambiguity, the Court could not accept the challenger's interpretation of the statute, whereas it did not say that it couldn't accept the statute, the Secretary's interpretation. And the Supreme Court case that I'm sorry I'm not very good at pronouncing that Delgado relies on was an instance where the agency itself didn't look at the text at all because it felt itself bound by Supreme Court precedent. So I think both of those cases are very distinguishable from this instance. And I think the better course is the Riverkeeper Energy line of cases that says where the question for the Court is whether the Secretary's interpretation is a reasonable one. So as to 6C, your argument now is it's not waived? Is that the argument? No. We still think it was. Their the plaintiff's theory of statutory interpretation was waived. And this Court can stop right there. But I just wanted to be clear that the Secretary also, the record does show that the Secretary gave effect to that provision. And you name me one case where a Court has found an issue waived in a non-formal, non-notice comment agency proceeding where regulations did not set for an adversarial procedure? Well, I actually think the city and county of San Francisco case cited by the Nation is a pretty analogous case. Do you think that's what that is? Well, it's an analogous case. It's analogous, but it isn't this case, is it? Well, to be sure, it's not this case. But we're – I mean, the fundamental principle of administrative law is that when people participate in the administrative process, they not play, for lack of a better term, hide the ball and not set forth all of their arguments. And that goes back in Supreme Court precedents of Vermont Yankee and most recently in Public Citizen. But I don't think that's the case in this case, which, you know, there is a little troubling in these non-adversarial proceedings as to where outside parties come in. But even if you could fault those who landed fair score in the process, Arizona and the two individuals would say, you know, we weren't playing in the game, so we shouldn't be precluded. But none of them have affirmatively stated in any of the pleadings that they didn't have actual notice of the proceedings. And so the notion that one could – they have no case that says that a person with actual notice of ongoing agency and proceedings can just stand by and wait until the agency proceedings run their course and then raise an issue that was not raised during that administrative process where people participated in it, can raise it for the first instance. Well, the difficulty with it, you know, they don't have such a case, but it does seem a little troubling that as a citizen, for example, you'd have to divine when and how to participate, because there's no process like there is in a normal adversarial administrative proceeding. So probably you should keep moving. Yeah. I won't belabor this. I will say that there were plenty of individuals who submitted, and we noted this in our brief, that submitted materials. But in any event, I want – I mean, so on the 6C issue, though, I think the important point is that the interpretation of the statute here, there's nothing saying that the 9,880-acre limit is a limit on the amount of land that can be – can be purchased by the nation. Are you leaving 6D for Mr. Waxman? No, no, I will turn it out right now. I know that that's what happened over here. Before you get to 6 – before you get to 6D, I take it that, apart from the specific interpretation, which we're going to get to about within, but D and C are joined together, in your view, in operation. Is that right? Yes. Yes. That D has an explicit cross-reference to subsection C, and that those – the 9,880 acres is a limit on the amount of land that can be acquired in trust under subsection D of 6. So your position would be if the nation spent all of its – was it 30 million? If they spent all of its money on community development and not buying land or economic development, that it could take other money and go out and buy land, and as long as it didn't ask the government to take back more than 9,800, et cetera, that that would be okay? That you could take that other money, buy land, and it could come into the trust? Yes, that's correct. That the 9,880 acres are solely a limit on the number – amount of land that the nation can apply for and have held into trust by the Secretary under this statute. Okay. And would Congress have had the authority to say that here's your 30 million and actually you can have 35,000 back in trust lands? Would they have had that authority? 35,000 acres. Acres. Acres. Yes. I mean, they could have – I mean, they could have set how much – let me make sure I understand the question. They could have set in this Act how much land the Secretary was going to author – be authorized to acquire in trust pursuant to this Act. There are other statutory provisions such as the Indian Reorganization Act pursuant to which a tribe can apply to have land taken into trust. But it would have been within Congress's power to set the number of acres in this Act. And it wasn't actually cabined by the amount that they took, although here there's a parallel between, you know, what went away and what could come back, correct? There is a parallel, but I don't think that's of any – I mean, it was not a limit on Congress's authority. And just on the Section 6d issue, the Secretary – I just want to also be clear that at excerpts of record, page 30, note 6 on this, the Secretary said even if the statute is as I have construed it, I would exercise my discretion and would – and in resolving the ambiguity, would find that Parcel 2 is eligible for trust acquisition. That's where we say – that's where we find the language that the Secretary    It's not the case. It's not the case. And the Secretary said that, you know, we would exercise our discretion in this particular matter. Well, the Secretary has – Yes, that's the best effort you have. Well, that combined with the reference to the field solicitor's memorandum that set forth the analysis that the Secretary relied on and noted in the opening of reaching his decision. So I think those two. If we didn't agree with the Secretary's plain language, you're saying that he's already gone to step two. Right. Right. And I still think – and even putting all of that aside, I still – the questions we talked about earlier, the question for the Court is still whether the Secretary's interpretation under Riverkeeper and Energy – or Riverkeeper v. Energy is a reasonable construction of the statute or a permissible one. And I think that clearly is the case here. If that's so, and you know what the Supreme Court has suggested in Gregory v. Ashcroft, where is the clear statement by Congress that they have authority under the Supremacy Clause to preempt the state laws in areas traditionally regulated by the states? A couple of things on that, Your Honor. First of all, I don't think there's any substantial constitutional question in this case. No court has ever agreed with the kind of Tenth Amendment arguments that are being made here today. But in any event – We're not talking Tenth Amendment here. As far as some part of it, I'm talking about the questions that we ask you to address. Sure. Of course. Secondly, there's nothing unique about the Federal Government acquiring private land in a state. That happens all the time. National forests. And it is clear that Congress has the authority to regulate on that Federal land. So there is no substantial question or impact to state sovereignty at all in this matter. It's a question of Supremacy Clause. Well, don't you think that the state sovereignty is interrupted? I mean, they're talking about zoning here. They're talking about what they need to do in those particular situations in order to protect the children and the schools and all of that. In this particular situation, that's a state interest. That's what they've always used. I think that's a question of regulatory authority, though, Your Honor. This isn't regulating the state qua state. It's not abrogating a constitutionally recognized Eleventh Amendment sovereign immunity from suit. It's not commandeering a state official to do anything. It's a function of the Supremacy Clause and the Federal Government's power under the Indian Commerce Clause and the Federal Property Clause to legislate in this area. And when Congress does so, it is supreme. And that happens in any number of circumstances. So there's no unique state sovereign question here. And I would say they didn't need anything clear because it isn't unique. They didn't need anything clear in this statute. Let me just also say, even if there was a necessity of some sort of clear statement, this Act could not be any clearer that what Congress intended was to create a reservation in the State of Arizona. There's no ambiguity to resolve as to that question. Well, we're not really talking about whether there's going to be a reservation in the State of Arizona. We're talking about where that reservation is going to be put. Well, right. And in what counties, what land ought to be there. Right. But to the extent the canon of construction is to avoid, is to say that Congress must stake unmistakably if it's going to displace state sovereignty. I want to be clear. I don't agree with the premise that there's any displacement of state sovereignty here, but even if there were, Congress has made that unmistakably clear. It has said that it is, there will be a reservation in the State of Arizona. The question is where. And that's not going to change the impact to the State of Arizona. I see I've gone over my time. Unless the panel has more questions, I'll defer to Mr. Waxman. All right. Thank you, Your Honors. Thank you. If you could put 8 minutes for Mr. Waxman, is that correct? I hope so. He used up all your time, but then that's been true of everyone today. So we're being a little bit lenient on the time. We give everybody back the time they asked for. Thank you. I think I'll speak first to the Gregory v. Ashcroft question that was posed to us on Monday, and then go directly to why the Secretary's determination of the meaning of 6C and 6D is correct, and in any event, a remand would not only be futile, but would be contrary to the purposes of this Act. As to Gregory v. Ashcroft, it has no application here for the following reasons. It imposes a clear statement rule where there is grave constitutional doubt, depending on the interpretation. Now, if the issue in this case is whether or not Congress has spoken clearly about the creation of an Indian reservation of 10,000 acres in the State of Arizona, Section 6D could not possibly be any clearer. If the question is, and I infer that this might have been your question, Judge Smith, about the clarity of the meaning of the within the corporate limits issue, that is, is it a municipal boundary or is it unincorporated county boundaries, the answer to that question doesn't affect the regulatory authority or sovereign jurisdiction of the State either way. That is, this is land within the State of Arizona. The State has certain regulatory authority over land, whether it's in a county or whether it's in a city, and the Tenth Amendment does not, emphatically, does not speak to the powers of towns or municipalities. Whatever, I don't think that the creation of an Indian reservation does vitiate state sovereignty, and the Supreme Court in Nevada v. Hicks and Cabazon has said so many times. But in any event, if the difficult interpretive question is what's the meaning of within the corporate limits, whatever the answer to that question is will not affect whatever impairment of State regulatory jurisdiction exists at all. And in addition, this is not an instance, Judge Smith, in which there would be no problem with this, but it isn't even an instance in which Congress says, we love this Indian tribe, we don't really like this State, let's give them a humongous reservation in the middle of the State and reduce from the State's regulatory jurisdiction a large part of its land. This is an acre for acre replacement of land that was an Indian reservation even before the State of Arizona was admitted. This is simply transferring 9,880 acres that were subject to the Federal Supremacy Clause for another 9,880 acres. So the Gregory v. Ashcroft rule isn't implicated here. I also forgot the principal reason, which is this is not a regulation of States as States. It is, as Mr. Avila was saying, the application of ordinary preemption rules when the United States takes title to property within a State under the property clause, it can make whatever needful rules it chooses, and to the extent that there is a conflict with State regulatory jurisdiction, that incident of regulatory jurisdiction is preempted. Now, with respect to Section C and 6d, I think I just want to, I think, reiterate what Mr. Avila has already said, which is the Secretary's interpretation of 6c and 6d are correct. They are, in any event, entirely reasonable. And a remand in this case where we're talking about two pure questions of law that have been addressed by the Secretary, that have also been explicated by the Secretary is a defendant in this case. In the Secretary's briefs before Judge Campbell and the Secretary's briefs here, a remand would be pointless. The Secretary has grappled with this question. He has made a determination. And even if you concluded, and honestly, Judge Smith, I realize that, you know, the sentence, but it's hard to imagine how it could be clearer. Even if you completely ignored that and said, you know what, I'm not going to pay any attention to what the Secretary has said in his briefs here or below, and I'm not going to pay attention to anything the Secretary says in his footnotes or the references he made to the regional solicitor's analysis. I'm just going to take what he said is, this is Chevron step one, and I don't have to consider any of the other canons of construction or policy implications under step two. You would still be required to decide this pure question of law under this Court's precedent in Railway Labor Executives, which is cited and discussed in our papers. That is, where the issue is a pure question of statutory interpretation, the ordinary administrative principle of SEC v. Chenery doesn't apply. This is, this case really is on all fours. In that instance, the administrative agency had made a step one determination in that case, and this Court said, we think it's ambiguous, but we are nonetheless going to defer to the Secretary's interpretation, and we think it's the better reading. And, you know, and Railway Labor Executives is no outlier. It is a rule that has been applied in many, many circuits. It's entirely different if you're talking about, well, the Secretary never really applied an acknowledged rule to disputed facts, or the Secretary came to court and changed his position, and, you know, which does happen sometimes. In those instances, yes, a remand is important, is appropriate. But, you know, I think that far from supporting our opponents, this Court's en banc decision in Delgado really is on all fours. In that instance, the INS or the BIA, I can't remember which, had rendered a plain meaning interpretation and had also indicated that in any event it was also the Attorney General's view that this was the better view of the law. And what this Court said was, we don't think it's plain, but the Administration also made an alternative determination under Chevron Step 2, and we defer. Now, there's a lot of furor over this footnote in Judge Fischer's opinion. But what the ---- Right. Yes. I mean, that's really what we're addressing. Exactly. But what the ---- But it ---- And I, you know, every opinion written by Judge Fischer deserves the most careful attention. But what they said, what they said was, look, you know, Delgado is arguing that because the meaning isn't plain, you should adopt his interpretation. Right. Number one, the footnote says, we have found that the meaning isn't plain, but the Attorney General or the BIA has indicated that alternatively it has this meaning. And, and I guess this is the relevant sentence, in any event, even if the Secretary or the Attorney General hadn't explicated Chevron's Step 2 interpretation, we couldn't rule for Delgado citing the Supreme Court's decision in Negussi. Now, Negussi couldn't possibly be clearer that what was going on in that case was as follows. And I quote, I mean, in that case, the issue was the construction of a particular term in the Refugee Act. The Supreme ---- the BIA in that case had said, we can't really even construe that term, because in the Trading with the Enemy Act, that issue in the Supreme Court's decision in Fedorenko, the Supreme Court has already said that that same language means X and it must mean the same thing here. And the Supreme Court said, you're wrong. That was a different statute. Fedorenko didn't talk about the Refugee Act. But, and now I'm quoting from page 1167 of the Supreme Court Reporter, quote, our reading of these decisions confirms that the BIA has not exercised its interpretive authority, but instead has determined that Fedorenko controls. In other words, the reason for the remand in Negussi was that the agency acknowledged that it had never interpreted the words of the statute under Chevron Step 1 or Step 2, because it thought it had to follow the Supreme Court's construction of the identical words in another statute. And all the Supreme Court said is that doesn't follow, and we would like to say ---- If we were to argue under Step 2 and we said it's reasonable, then you would agree end of that portion of the case. If we were to say they really urge a reasonable or even more reasonable option than the Secretary laid out, in that case, would we need to remand rather than deciding it ourselves because the Secretary may have some intermediate interpretation? No. First of all, the rule in Chevron is not that the agency doesn't get deference if the Court thinks that its interpretation or an interpretation of an adversary is more reasonable. The Supreme Court has made very clear that so long as the Secretary's interpretation is within the scope of a reasonable interpretation, deference is required. And in any event here, we also have the interpretive canon applied by the Indian canon of construction, which points in the same direction. But I think my question was perhaps not clear. Maybe I'm sorry. That's if you go down the road that it's all reasonable and we agree and we say it's reasonable and there's 29 reasons that it's reasonable. If we were to determine that it's unreasonable, in your view, is that a statutory interpretation left to the Court or is there ground then to remand to the Secretary? No. I mean, if you find, if you disagree with the Secretary that the plain meaning requires, supports his interpretation, and if you also say the Secretary's Chevron Step 2 inquiry yields an unreasonable result, you have to say so. I mean, at some point, it's got to be the Court. No, I understand. But the reason I'm just trying to be precise is because the word remand keeps roaming around the courtroom today. And it does seem that the Supreme Court and our cases actually tell us up or down to decide that. Yes. And in fact, you know, I would emphasize the Amtrak v. Boston and Main case, which I think is very much on all fours here, where the agency, the Supreme Court deferred to the agency's implicit interpretation. The agency didn't even, unlike here, with respect to 6C, the agency didn't discuss this particular provision at all, but the Court found that that interpretation was a necessary presupposition. And it didn't say, well, you know, there's no evidence in the Secretary's, you know, ruling that he doesn't cite this thing, or even if he cites it, he hasn't given the full warp and woof of all of his interpretive rationales. This is just obvious. The Supreme Court said, obviously, the Secretary interprets this provision to mean this. Otherwise, he couldn't have taken this final action. That's reasonable. We'll defer. And this case is much, much stronger than that. I mean, with respect to 6C, you know, as Mr. Avalos pointed out, the field solicitor actually does explain that's exactly how 6C works. I think it's on page 8 of his opinion. Everybody in the process was completely on notice that this is the way the Secretary was interpreting it. Gila River, which has raised this issue for the first time in the district court, not only participated extensively in this, but knew precisely how many acres that what it now claims is brand-new evidence, admitted to Judge Campbell that in the administrative process, it had Resolution 364, which, as our brief points out, explicates in every particular detail the facts and circumstances of the acquisition of the Painted Rock property, with what money, by whom, and for what reason. That information was in front of the Secretary because that application was pending when Parcel 2's application was in. It was discussed in the case. Sotomayor I want to wrap it up now. Waxman I'll wrap. I will take that as a helpful suggestion and ask that the judgment be affirmed. Sotomayor Thank you. I'd like to thank all counsel for your arguments this morning. We've given pretty extensive time to everybody. I want to say that I think both the briefs by everybody have been very helpful. The arguments have been very helpful. The case of Glendale v. United States is submitted and we're adjourned.
judges: McKeown, Nr Smith, Cjj Nguyen ( C. Cal.), Dj